CarutheRS, J.,
delivered the opinion of the Court.
The original hill was filed by the children and legatees of James Elliott, deceased, on the 6th of May, 1845, against the various executors and administrators, with the will annexed, *508 for the settlement of the estate, and recovery of the amounts due them, respectively.
The will was made October 30, 1836, and at November Term folloAving of the County Court for Rutherford county, it was proved, and John Elliott, the testator’s brother, and Silas Tucker and George Thompson, were qualified as executors. The will directed certain property, real and personal, to be sold, the debts paid, and the residue to remain in the hands, and to be managed by the executors for the support, welfare and comfort of the widow, and her six children. The widow dissented at the January Term, 1837, and received what the law allowed her. By the 25th of December, 1836', the executors, by sales of property, &c., under the will, had in their hands $13,459.87. Out of this the widow received her one-seventh. With the exception of $1,023.67, the proceeds of the cotton crop on hand at the testator’s death, received by Tucker, all the funds of the estate went into the hands of the active executor, John Elliott. The first settlement was made with the clerk of the County Court, in July, 1839, showing in the hands of Elliott $4564.47, as the whole of the assets after deducting disbursements. On the 17th of December of the same year, another settlement was made, bringing the account down to 1st of January, 1840, showing in his hands, including notes on Henry and Cothron, and his own indebtedness to testator, $9369.29. At this time Thompson and Tucker becoming uneasy on account of their joint liability, required a bond of indemnity from Elliott, which he failed to give, and then the assets, amounting to 11,441.63, were partitioned among them. Each, it seems, were expected to secure the others against liability for waste by either, with respect to the amount in their hands, respectively. This not having been done by Elliott, on the 22d of January, 1840, Thompson and Tucker filed their bill to compel him to surrender the estate, and account for his executorship. At the. August Sessions, 1840, of the County Court, Tucker and Thompson resigned, and Elliott became sole executor, and gave a new bond for the faithful performance of his duties *509 with Cowan, Mitchel, Avent and Anderson, bis sureties. The two-thirds of the assets, in the hands of Tucker and Thompson, were then returned to Elliott, and their bill soon after dismissed. In May, 1841, he made his first settlement as sole executor; his second, in April, 1842, and his third, in March, 1843. In all these settlements he was charged with all the assets. In the first, ¡$11,067.21; the second, $12,-289.90, and the third, $13,086.28. In May, 1843, he resigned, and Cowan was appointed administrator with the will annexed, with his co-sureties and Elliott to his bond. Cowan made his first settlement, April 18, 1844, and a second, April 8, 1846, charging himself with all the assets, viz: In the first, $12,076.67, and in the second. $11,188.69. Soon after this, viz., 9th of May, 1845, the bill in this case was filed by the heirs of James Elliott, the testator, against all the original executors, and Cowan, and his sureties, praying for an account of the administration. In January, 1847, Tucker and Thompson filed their cross-bill against all the other defendants, praying to be exonerated from all liability, at least in the first instance.
Another important fact in view of the questions which arise, should be here stated. Between the first and second settlements made by Elliott as sole executor, viz: on the 1st of April, 1842, he made a deed of trust to one James M. Avent, on his real estate and slaves, to indemnify and make safe the sureties in his bond, on account of their liability for his administration of the estate.
It turns out upon investigation of the case, according to the reports under interlocutory decrees, of which there have been many in the fifteen years this case has been pending, that Elliott wasted the estate, and that he only paid over to Cowan, his successor, $2581, although in the settlements of the latter, he charged himself with the whole estate, leaving the balance of the $13,036.28, viz., $10,455.28, unaccounted for, or wasted. In the last settlement of Cowan, however, made 8th of April, 1845, just one month before this bill was filed, the amount seems to have been reduced by credits to *510 $11,188.59. But the property of Elliott sold under the deed of trust, netted $11,287.52, leaving apart unsold. So it appears that Cowan received from Elliott in these two sums, $13,868.52. After all this, it seems, that in the final decree, Thompson and Tucker are made liable for $3931.70, for the devastavit of their co-executor, Elliott, previous to the 3d of August, 1840, -when they resigned, and Cowan and others became responsible. The case was before this Court in 1850, when a decree of 1848, made by Chancellor Caha.1, by which Thompson and Tucker were exonerated from primary liability, was reversed, and the cause remanded to ascertain, among other things, what was the amount of the waste committed by their co-executor, Elliott, prior to August, 1840, for which they were declared to be primarily liable. Chancellor EeteR-SON settled the amount as above stated in his decree of 185-, and ordered the retaking of the account upon other matters. The final decree, by Chancellor Ridley, was in conformity to the said interlocutory decree on this point. Thompson and Tucker appealed, and so did the complainants on other matters in relation to the account, and final decree.
The complainants have no interest in the question made by Thompson and Tucker, as the devastavit must be made good to them, and the only, question is, by whom it shall be dono ?
We are entirely unable to see upon wdiat principle of law or equity the co-executors can be made, primarily, liable. True, if the devastavit occurred while they were joint executors, as probably it did, to the extent stated, they would be bound under the circumstances, to make it good, unless that has been done by Elliott, who committed it. But if this has been done, they are clear, and the responsibility is changed to their successors for the whole estate. The above facts clearly show that Elliott, by his money, and his property, has paid over more than ever came to his hands, before August, 1840. It follows then, beyond all controversy, that Tucker and Thompson are released, and that the burthen of accounting for the whole estate, whatever it is, devolves upon John Elliott and his sureties of 1840. It is said that there is a loss which *511 must fall upon either the securities of 1840, or the co-executors 'who then resigned, as it turns out that the trust property is not sufficient to save both; and that, as the deed of trust is expressly made to indemnify and save harmless the sureties of 1840, and not the retiring executors, the loss must fall upon the latter to the extent of any prior waste, as they (the sureties) should enjoy the advantage of their superior vigilance in guarding themselves against it. But the substance of the transaction was to secure and make good the estate then in his hands, or which he had wasted, by the application of his own property; and if this were not a sufficient answer to the position, the fact that by himself, and his trustee, he has paid more than he was liable for when they resigned, must surely discharge those who were bound, by their association with him, for his acts prior to that time. The difficulty in the case is, not to arrive at this conclusion, but to see how any other could be arrived at.
An attempt is made to diminish the estate, by showing that John Elliott was entitled to a credit, which he has never been allowed, for $3310 paid by him for two debts of his testator as endorser for Alfred Elliott, one to deputy sheriff Burton, for $2410, and the other to a man by the name of Word, for $900. These credits were not claimed in his various settlements with the County Court. That is a strong presumption against them, particularly as the amounts are large, and he hard pressed for vouchers. But we think the proof does not sustain these claims as demands against the testator; but it shows that in law, whatever they might have been originally, they had been made the individual debts of John Elliott. The evidence is too obscure to satisfy the mind that they ever were valid demands against the estate of James Elliott. But if they were, John took them upon himself to favor his brother Alfred, and thereby released the estate. He may have used some of the assets of the estate to do this, but that does not change the case.
We hold, therefore, that John Elliott, and his sureties of 1840, are liable for the whole estate. The proceeds of any *512 other property, embraced in the trust deed, not yet sold, shall he applied in exoneration of the sureties of 1840, to that extent, as well as any rents and profits which may have accrued upon it in the hands of the trustee.
There are sixteen exceptions taken for complainants, and nearly as many on the other side. We have examined them, and need only say, that we think the action of the Chancellor upon them was correct, except as to that exception of complainants which controverts the allowance of a credit to defendants of about $600 for insolvent debts, with which the executors had charged themselves. We think this claim of a credit comes entirely too late, and is not well made out by the evidence. Without going into the argument made in favor of this exception, it is enough to say, we consider it well taken, and allow it.
The decree will be modified in conformity with this opinion.